# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CARPENTERS HEALTH AND WELFARE :      CIVIL ACTION
FUND OF PHILADELPHIA AND VICINITY, et al. :

            Plaintiffs     :      NO.  02-CV-4650

       v.            :

PHK SERVICES, INC. d/b/a and t/a :
McCABE CONSTRUCTION :
and d/b/a and t/a PHK SERVICES :

         Defendants    :

## DECLARATION  OF PIOTR TONIA

Piotr Tonia states under penalty of perjury that the following is true and correct:

1.      My name is Piotr Tonia and my business address is Carpenters Health and Welfare Fund of Philadelphia and Vicinity, 1803 Spring Garden Street, Philadelphia, PA  19130.

2.      I am the Collections Manager for the Plaintiffs Carpenters Health and Welfare Fund of Philadelphia and Vicinity, Carpenters Pension and Annuity Fund of Philadelphia and Vicinity, Carpenters Joint Apprenticeship Committee of Philadelphia and Vicinity, and Carpenters Political Action Committee of Philadelphia and Vicinity ("Funds") and am authorized to make this Declaration on behalf of the Funds.

3.      I have a Bachelor of Science Degree with a major in Accounting from Elizabethtown College.  I have been employed by the Funds since January 5, 1998.  From January 5, 1998 to March 31, 1999, I was a Collections Clerk.  On April 1, 1999, I was appointed Collections  Manager.  I am trained and experienced in the audit of employer records with respect to contributions due employee benefit plans and the interpretation of collective bargaining agreements requiring such contributions.

4.      As Collections Manager of the Funds, I am charged with keeping and maintaining

109996-1

records of contributions received by the Funds; maintaining individual records of each person, firm and corporation required to make such contributions to the Funds; and supervising audits of contributing employers.

5.    The Funds audit employers in connection with delinquency collection lawsuits. In performing these audits, the auditor reviews the payroll records of each employee who performs work of the type covered by the collective bargaining agreement. These records will include time cards, payroll ledgers, payroll summaries, time slips, or such other payroll records as the company maintains which will indicate the number of hours that each individual employee worked and was paid for each week. The information gathered from these records is then compared to the wage information found on the employer federal, state and municipal tax returns and on the W-2 statements provided to the employees. After compiling the information gathered from the above records, a schedule of the contributions that should have been paid according to the contract is prepared. This schedule, which is broken down month by month, is then compared to the actual contributions which the Company did submit to the Funds with any differences noted. Once completed, the audit conclusion, as well as the audit work papers, are forwarded to the company for its review and payment.

6.    I have personal knowledge of the contents of the collective bargaining agreements, and the Agreements and Declarations of Trust referenced in the Funds' Complaint previously filed in this case.

7.    The Funds, as part of their normal operating procedure, maintain files containing copies of all remittance reports submitted by contributing employers, and all correspondence sent to the Company from the Funds. Additionally, records are maintained of all contributions which

are paid to the Funds by each contributing employer. This file indicates the name of the contributing employer, his account number with the Funds, the amount paid, the date it was paid and the month or months to which the payment was credited. The Funds' records also include the names and social security numbers of each covered employee employed by that employer.

8.    My review of the regular business records maintained by the Funds reveals that Defendant PHK Services, Inc. d/b/a and t/a McCabe Construction and d/b/a and t/a PHK Services became signatory to a collective bargaining agreement ("Labor Contract") between the Interior Finish Contractors Association of Delaware Valley ("IFCA") and the Metropolitan Regional Council of Philadelphia and Vicinity United Brotherhood of Carpenters and Joiners of America f/k/a the Metropolitan District Council on April 19, 1999, as "PHK Services, Inc." and again on January 6, 2000 as "PHK Services, Inc. trading as McCabe Construction". True and correct copies of the Agreement and the individual short form agreements signed by the Company are attached to the Motion as Exhibits 2 and 3.

9.    The Company failed to submit all required remittance reports and/or failed to submit all required payments with the remittance reports it has submitted in the period April 1999 to the present. As a result, the Funds attempted unsuccessfully to schedule a contribution compliance audit of Company on February 22, 2002 and April 22, 2002. The Company has refused to respond to the Funds' requests.

10.    The Funds are unable to determine the precise amount the Company owes to the Funds. The Funds attempted a contribution compliance audit of the Company's records pursuant to the Labor Contract. However, the Company did not authorize the Funds to schedule an audit. The company has failed to provide the records necessary to determine the exact amount owed to

the Fund.  These records include the cash disbursements journal and general ledger, check

registers for all accounts and cancelled checks, job/project contracts and time records showing

employees and hours worked on each project, unemployment quarterly returns for Pennsylvania

which detail by employee wages paid and the Form 941 federal quarterly returns.

12.    As a result of the Company's failure to produce all records needed to complete the

audit, it would be imprecise, and not in accordance with prudent accounting practices to estimate

or determine the amount of unpaid contributions and liquidated damages due and owing to the

Funds without an audit.

13.    I have executed this Declaration in Support of Plaintiffs' Motion for Default

Judgment against Defendants and request this Court to consider the same as proof in support of

the allegations contained in the Complaint of the Funds and other facts stated in this Declaration.


Pursuant to 28 U.S.C. §1746, I declare under
penalty of perjury that the foregoing is true
and correct.

PIOTR TONIA

Executed on:  1/29/03

109996-1                            4

EXHIBIT 2

# AGREEMENT

between the

## GENERAL BUILDING CONTRACTORS ASSOCIATION, INCORPORATED

and the

## CONCRETE CONTRACTORS ASSOCIATION

and the

## METROPOLITAN REGIONAL COUNCIL OF PHILADELPHIA AND VICINITY

UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA

EFFECTIVE MAY 1, 1997
THROUGH APRIL 30, 2001

Counties of Philadelphia, Bucks, Montgomery, Chester, Delaware, Lehigh, Northampton and Carbon

---

**2**

shall notify the other in writing at least ninety (90) days prior to the expiration of the term, or of any extended term, of the intention to change or amend any of the provisions of this Agreement upon expiration of its term or of any extended term thereof. Such notice shall be served by certified mail post marked not less than ninety (90) days prior to such expiration date.

(b) Should either party give notice to the other as aforesaid, then, within thirty (30) days after the mailing of said notice, representatives of the Association and of the Council shall meet to discuss, negotiate, and agree upon such changes. If no agreement as to such changes is arrived at before the expiration of the term or of any then current extension of the term, of this Agreement, then the whole of this Agreement shall be considered terminated upon the expiration of the term, or of the then current extension of the term of this Agreement, unless extended by mutual agreement in writing of the parties hereto.

## ARTICLE 2

**Employees and Employers Covered by this Agreement**

(a) This Agreement shall apply to all persons, whether Journeymen, Apprentices or Foremen, who perform any work within the jurisdiction of the Council and of the United Brotherhood of Carpenters and Joiners of America, including but not limited to carpentry work, lay-out work, millwright work, wharf and dock building work, pile-driving work, hardwood floor laying work or taking on any project or job on which an Employer holds a contract, (which persons are hereinafter referred to as "Journeymen-Carpenters" or "employees"); provided, however, that when an Employer employs an employee upon

---

**3**

wharf and dock building work or upon pile-driving work, the terms and conditions of employment under which such work shall be performed shall be those set forth in the then effective collective bargaining agreement between Wharf and Dock Builders' Local Union #454 and the Wharf and Dock Builders' Association of Philadelphia and Vicinity, or when an Employer employs an employee upon millwright work, the terms and conditions of employment under which such work shall be performed shall be those set forth in the then effective collective bargaining agreement between Millwright and Machinery Erectors Local #1906 and the Philadelphia and Vicinity Millwright Contractors Association.

(b) No employee, or applicant for employment shall be discriminated against by reason of race, religion, color, sex, age or national origin and the parties hereto agree to comply with any and all State and Federal laws, and rules and regulations promulgated pursuant thereto, guaranteeing civil rights and liberties to all persons.

(c) This Agreement shall apply to the Employers listed in Schedule "A", attached hereto and hereby made a part of this Agreement, and to such other Contractors or Employers as during the life of this Agreement become members of the Association. The Association hereby represents that each of the Employers so listed is a member of the Association and that the Association is executing this Agreement on behalf of each such Employer pursuant to authority duly granted by each such Employer. The Association will advise the Council immediately of the admission of any new member to the Association, of the withdrawal, suspension, or expulsion of any Employer from the Association, and of the termination by

other means of any Employer's membership in the Association.

(d) Subject to the provisions of Article 7 hereof and to the provisions of Article 16, Section 3 (b) (B) (ii) (as contained in the Memorandum of Understanding attached as Schedule "E") relating to reciprocal agreements, this Agreement shall apply only to work within the Counties of Philadelphia, Delaware, Bucks, Montgomery, Chester, Lehigh, Northampton and Carbon in the Commonwealth of Pennsylvania.

(e) Notwithstanding any other provision of this Agreement to the contrary, in the event that an Employer bound hereby shall perform work within the meaning of this contract within Lehigh County, Northampton County and Carbon County, then all such work shall be performed in accordance with all terms and conditions of the Collective Bargaining Agreement then in effect between Carpenters Local Union #600 and the Lehigh Valley Contractors Association, Inc.

(f) To protect and preserve, for the employees covered by this Agreement, all work they have performed and all work covered by this Agreement, and to prevent any device or subterfuge to avoid the protection and preservation of such work, it is agreed as follows:

If the contractor performs on-site construction work of the type covered by this Agreement, under its own name or the name of another as a corporation, company, partnership, or other business entity including a joint venture, where the contractor through its officers, directors, partners or owners exercises directly or indirectly management control, the terms of this Agreement shall be applicable to all such work.

## ARTICLE 3

### Working Hours and Holidays

(a) The regular or normal work week shall consist of forty (40) hours, and regular or normal hours and days of work shall be eight (8) hours, interrupted by a meal period of one-half (1/2) hour, time to be made between 7:00 A.M. and 5:30 P.M., Monday through Friday, both inclusive. Subject to the approval of the Regional Council, the regular or normal eight (8) hours of work, Monday through Friday, may be made between 6:00 AM and 5:30 PM, without incurring overtime pay. When more than one employer on the same project employs carpenters, the starting time for all employees shall be uniform. Non-uniform starting times may be allowed on a particular job site by mutual agreement between the Union and the Employer. Disputes over failure to reach a mutual agreement will be subject to the grievance procedure.

(b) Unless the Council or the Business Representative of the Council for the area in which the work is being performed has given to the Employer permission for such work, no work shall be performed on Labor Day, New Year's Day, Memorial Day, Independence Day, Thanksgiving Day and Christmas, nor on any Saturday or Sunday, nor shall any extra shift work be performed.

(c) When a permit is granted for overtime work, employees engaged in such work shall be paid at time and one-half the rates specified in Article 4, Sections (a) and (b), and Article 6, Section (b), of this Agreement, except that work performed on Sunday and Holidays shall be paid at the rate of double time.

hours pay for Saturdays, Sundays and holidays). Employees shall not be required to work until all wages are paid in full.

The foregoing provisions of this subparagraph (e) shall apply except where the Employer proves that due to an Act of God, robbery or an accident, it was not possible to comply with said provisions.

(f) An itemized statement shall be included in pay envelopes or upon check stub. Said statement shall show gross income, deductible items, and the net amount. This statement or check stub to be retained by the employee.

(g) Upon thirty (30) days written notice to the Association, the Council may in its discretion determine that:

(1) a portion of the wages provided herein shall hereafter be paid to the fringe benefit funds provided in Article 5 (Joint Apprentice Committee), Article 16 (Health and Welfare Fund) and Article 17 (Pension and Annuity Funds) as if fully set forth in that Article; or

(2), the existing Employer contributions to those aforementioned Funds otherwise provided in the Agreement shall be amended between and among those Funds in such manner as the Council shall deem appropriate, provided only that such reallocation of fringe benefit contributions shall not impair the financial or actuarial soundness of the affected Funds.

## ARTICLE 5

### Apprentices

(a) Each Employer shall, on or before the tenth day following the end of each calendar month, pay to

Mellon Bank, or to such other corporate fiduciary as shall be from time to time mutually agreed upon by the Association and Council (any of which is hereinafter referred to as the "Depository" or "Trustee"), an amount determined by the Joint Apprentice Committee Financial Sub-Committee as specified in this Article for each hour (whether regular time or overtime) for which wages or any type of compensation payable under this Agreement, are payable during such calendar month to any employee, as the term employee is defined in Article 2 hereof. Each such hour is hereinafter referred to as an "hour worked."

The amount of the Employer Contribution required to conduct the operation of the Carpenters' Joint Apprenticeship Committee shall be determined unanimously by the Joint Apprentice Committee Financial Sub-Committee.

The Financial Sub-Committee shall be composed of two (2) representatives appointed by the Metropolitan Regional Council and two (2) representatives appointed by the General Building Contractors Association, Inc.

On or before January 1, of each year the Financial Sub-Committee shall determine the cents-per-hour employer contribution required for the expenses of the Apprentice Program.

Should the Sub-Committee agree to increase the contribution to the J.A.C., it shall become effective May 1 of that year.

The collection procedures for the above-noted contributions shall be in accordance with the procedures outlined in Article 19; and for delinquent payments shall include, in addition to the payment of the principal sums due and owing, the payment of ten percent (10%) in liquidated damages, interest cal-

## 10

culated in accordance with ERISA, all costs of suit (including reimbursement for Fund administrative time) and attorneys' fees and costs, regardless of whether suit or other formal proceedings are instituted.

(b) All Employers shall participate in the apprenticeship training program and shall employ apprentices as directed by the Carpenters' Joint Apprenticeship Committee of Philadelphia and Vicinity (hereinafter in this Article referred to as the "Committee"). The Committee shall consist of an equal number of members designated from time to time by the Association and by the Council, respectively, and with the right of the Council and of the Association, respectively, to supplant any or all of the members theretofore designated by either of them.

(c) The employment of Apprentices shall be in accordance with the terms and conditions of the Standards of Apprenticeship heretofore, adopted, and as amended by the aforesaid Committee, and in accordance with the rules and regulations governing apprentices and their tools as set forth and provided therein. A true and correct copy of said Standards of Apprenticeship, marked Schedule "B", is attached hereto and made part hereof. It is further agreed as follows:

In the event of the liability of the Committee within sixty (60) days after any subject is brought before it (other than a proposal for the conduct of an additional program or programs as mentioned in Section (e) hereof) to obtain a majority vote for or against such subject, the matter shall upon written request of any three members of the Committee designated by the Association or any three members designated for that purpose by the Council, be submitted to an arbitrator selected in the manner provided for in Article 14 of this Agreement.

## 11

(d) It is further agreed that:

(i) All apprentices shall attend day school classes as part of their apprentice training, and shall receive an educational grant from the Joint Apprenticeship Committee while attending day school classes supervised by the Committee.

(ii) The Committee shall employ a full-time Director of the Apprenticeship Program.

(e) The Carpenters' Joint Apprenticeship Committee will, out of the Carpenters' Joint Apprenticeship Training Fund, pay the costs, incurred or to be incurred, for the following activities and purposes:

(i) Such activities as the Committee is presently conducting, such as, supplying tools and books used by apprentices, paying instructors' bonuses, materials used in special projects, postage, graduation dinner expenses, and items in the nature of the foregoing.

(ii) Salary and expenses of the Director of the apprenticeship program.

(iii) Conducting additional programs which it may from time to time adopt in the following manner: A proposal for the conduct of such additional programs must first be introduced at a regular or special meeting of the Committee, and said Committee shall then fix a day not less than thirty days after such meeting for the purpose of having the Committee meet and act upon said proposal or proposals. At the regular or special meeting of the Committee held on the date so fixed for the purpose, among others, of considering said proposal or proposals, it shall require a majority vote of the members of the Committee in order to adopt such proposal. In the event of failure to obtain a

## 12

majority vote or in the event that the vote shall be a tie, the proposal or proposals shall be deemed to be rejected.

(f) It is hereby confirmed that the authority of the Committee includes the authority to amend the Standards of Apprenticeship to include or to adopt a rule or regulation, which when adopted shall be binding upon the Employer. Any Employer required to make contributions as provided for in Section (a) of this Article shall transmit his contributions to the corporate fiduciary selected by the Committee; such fiduciary to be furnished under the provisions of Article 19 shall also serve as security to guarantee the payments of said contributions; and the provisions of Article 19 concerning the time for making, and the reporting of payments shall also be applicable to said contributions.

(g) For the purpose of carrying out the provisions of this Article 5, a trust to be known as Carpenters' Joint Apprenticeship Training Fund of Philadelphia and Vicinity, which is incorporated herein by reference thereto, to be administered by members of the Carpenters' Joint Apprenticeship Committee of Philadelphia and Vicinity was established under date of May 1, 1969, for the purpose of receiving, administering and disbursing the monies to be received as provided for in Section (a) of this Article.

### ARTICLE 6

### Shift Work

(a) The period of work or shift whose regular hours fall completely between the hours of 7:00 A.M. and 5:30 P.M. shall be known as the day shift, and a

## 13

period of work or shift whose regular hours embrace any portion of the period between the ending of the day shift of one day and the beginning of the next succeeding day shift shall be known as an extra shift. When the Employer requires an extra shift of shifts, he shall apply to the Council's office or to the Business Representative of the Council for the area in which the job is located, for the permission to institute such extra shift.

(b) The rate of pay for work on an extra shift for the first five (5) days of the regular work week as above specified, (hereinafter referred to as the "extra shift rate") shall be ten percent (10%) above the rates specified in Article 4, Sections (a), (b), (c) and Schedule "D" of this Agreement. It is understood that when, in accordance with the provisions of Section (b) of Article 3, an extra shift has been established which begins after the day shift, only the extra shift rate need be paid for the first eight (8) hours of work on such shift on a Friday, despite the fact that such eight (8) hours will end after Midnight on Friday; work on such shift after midnight of the day preceding a holiday shall, however, be paid for at twice the extra shift rate.

(c) An employee working on an extra shift shall be paid eight (8) hours' pay at the extra shift rate, if he works less than eight (8) hours but more than four (4) hours; if the employee works four (4) hours or less, he shall be paid for four (4) hours at the extra shift rate.

(d) No extra shift shall be worked at the extra shift rate unless a day shift is working; where no day shift is working, all extra shift work shall be paid for at double the rates specified in Article 4, Sections (a), (b), (c)

16

with a key to the tool shed or tool room, and the employee will store therein all the tools not actually being used by them at any time.

(b) The employee may supply, at the time of hiring, a list of all personal tools which he has brought to the job. The Employer may review the list and may limit the number and type of tools which the employee has on the job.

The Employer shall reimburse each employee for any of his tools or clothing which are destroyed on the project site by fire or other act of God, or which, while the project is not operating are lost, stolen, destroyed or damaged on the project site, or the Employer may, at its option, replace such tools with the same make and model tools, or equal; provided that if the Employer has complied with the provisions of Section (a) above, he shall be liable for such loss or injury only if it occurs when such tools or clothing are in the place designated by the Employer for storage; and provided further, that the Employer liability shall be limited to not more than $400.00 for any single loss or injury to tools, and not to more than $100.00 per any single loss or injury to clothing; provided further that after the employee has supplied the tool list described herein, this limitation of liability shall not apply, and the employee shall receive reimbursement for or replacement of all listed tools.

The Employer will reimburse the employee for such loss or replace the tools and clothing not later than three (3) days after the employee furnishes the Employer with the properly sworn itemized statement of loss.

(c) Each employee shall, if so requested by the Employer upon reporting to be the job, furnish the

17

Employer a list of his tools. A written request from the Association for such lists, covering all the jobs of its members, shall be recognized by the Council as the equivalent of such request from each individual Employer who is a member of the Association.

## ARTICLE 10
### Jurisdiction

The Employer shall recognize the jurisdiction of the Union including but not limited to Carpentry, Millwrighting, Wharf and Dockbuilding, Floorlaying (as per Local Union 1823 agreement) and Lathing.

## ARTICLE 11
### Working Rules

Those of the Council's Working Rules set forth in Schedule "C" attached hereto and made part hereof, hereby made a part of this Agreement and set forth in detail certain of the conditions of employment which shall prevail during the term of this Agreement.

In addition, it is agreed and understood that if any employee ceases or refuses to work with a non-union employee, or chooses to comply with the provisions of Working Rule 17, such action shall not be deemed a violation of this Agreement and no employee shall be disciplined or discharged by reason of such action.

## ARTICLE 12
### Subcontracting of Job-Site Work

The Employer agrees that he will not subcontract any work which is covered by this Agreement that is to

20

named in said list decline or are unable to act, and if for any reason the appointment cannot be made from such first submitted list, said Association shall send a second list of names of persons chosen from the Association's Panels, and thereafter proceed in accordance with its rules aforesaid. The arbitrator thus appointed shall hold hearings as completely as possible and shall render his award in writing and such award shall be final and binding upon the Council and the Association and upon their respective principals or members. The arbitrator's fees and expenses and the fees of the American Arbitration Association shall be shared equally by the Association and the Council.

(b) Subject to the Working Rules set forth in Schedule "C" attached hereto and made part hereof, work will not be stopped under any conditions unless by permission of the arbitrator.

(c) Anything to the contrary hereinbefore contained notwithstanding, the Council may elect not to follow the procedure for settlement of disputes as: forth in Sections (a) and (b) of this Article 14 in respect of claims or disputes arising out of alleged failure by an Employer or other employee to comply with  ny of the provisions of Article 16 hereof, or of  rticle 17 hereof, or of Section (a) of Article 5 hereof (  Articles 18, 19, 22 and 28.

(d) Irrespective of whether the Council exercises the election granted to it by Section (c) of this Article 14, the Council may, in the event of a claim or dispute such as mentioned in said Section (c), treat as a breach of this Agreement the alleged failure by an Employer to comply with any of the provisions of Article 16 hereof, of Article 17 hereof, or of Section (a) of Article 5 hereof, or of Articles 18, 19, 22 and 28 hereof, and instead, by reason of such failure, persuades or directs employees covered by this

21

Agreement not to accept employment by, or to cease rendering any further service to such Employer, then the delinquent Employer or other delinquent employers shall be obligated to pay the wages and the fringe benefit contribution of such employee or employees who cease to render any further service to, or refuse to accept employment by, such delinquent Employer, until such time as the delinquent reports and/or payments, if due, have been made. In no event shall such wages or fringe benefit contributions be paid to those employees who were not employed at the time of such refusal to render further service or refusal to accept employment. Such permission or direction by the Council to the employees, and the cessation of work, or the refusal to accept employment, by the employees shall not be deemed to be a violation of Section (b) of this Article 14.

## ARTICLE 15
### Council Business Representatives

Business Representatives of the Council shall have access to any and all jobs where employees to whom this Agreement is applicable are working.

## ARTICLE 16
### Health and Welfare Fund;
### Industry Advancement Program

Section 1. The Employer shall, on or before the tenth day following the end of each payroll week, pay to Mellon Bank or to such other corporate fiduciary as shall be from time to time mutually agreed upon by the Association and Council (any of which is hereinafter referred to as the "Depository" or "Trustee"), a sum

## 22

as specified in Section 2 (for each regular hour (whether regular time or overtime) for which wages or any type of compensation payable under this Agreement are payable during such payroll week to any employee, as the term employee is defined in Article 2 hereof. Each such hour is hereinafter referred to as an "hour worked."

Section 2. Except as may otherwise be provided pursuant to the terms of this Agreement, the Health and Welfare payment rates for each hour worked are:

(a) $5.99 per hour worked for the period May 1, 1997 to April 30, 1998;

(b) May 1, 1998 to April 30, 1999;  
(c) May 1, 1999 to April 30, 2000;  To Be Determined  
(d) May 1, 2000 to April 30, 2001;

Section 3. (A). A trust heretofore established and known as "Carpenters Health and Welfare Fund of Philadelphia and Vicinity" shall continue to provide (out of the moneys paid into said Fund and out of the income from the investment of said moneys) for the sole and exclusive benefit (1) of employees and their dependents, and (2) of the "Participants", as hereinafter defined, and their dependents, such of the following benefits and services as the Council may from time to time, subject to the conditions set forth in the Agreement and Declaration of Trust, determine: Medical care, hospital care, compensation or annuities of illness, death benefits, vacation benefit, disability and sickness benefits, accident benefits, at any like benefits, and insurance to provide any or all of the foregoing benefits and services.

(B). The Carpenters' Health and Welfare Fund of Philadelphia and Vicinity shall be administered and maintained pursuant to a Memorandum

## 23

of Understanding attached hereto and incorporated herein as "Schedule E."

Section 4. The Industry Advancement Program shall be established and maintained pursuant to a Memorandum of Understanding attached hereto and incorporated herein as "Schedule F". The IAP payment rate is $.20 per hour worked.

### ARTICLE 17

### Pension and Annuity Plan

Section 1. The Employer shall, on or before the tenth day following the end of each Payroll Week, pay to Mellon Bank, or to such other corporate fiduciary as shall be from time to time mutually agreed upon by the Association and Council, (is hereinafter referred to as the "Depository" or "Trustee") a sum as specified in Section 2 for each hour worked for a Pension and Annuity contribution. For purposes of this Section, "hour worked" shall mean each hour (whether regular time or overtime) for which wages or any type of compensation required under this Agreement is payable during such Payroll Week to any employee, as the term employee is defined in Article 2 hereof. Each such hour is hereinafter referred to as an "hour worked."

The Annuity portion of the contribution will be earmarked to individual accounts.

Section 2. Except as may otherwise be provided pursuant to the terms of this Agreement, the Pension/Annuity payment rates for each hour worked are:

## 24

(a) $5.99 per hour worked for the period May 1, 1997 to April 30, 1998;

(b) May 1, 1998 to April 30, 1999;  
(c) May 1, 1999 to April 30, 2000;  To Be Determined  
(d) May 1, 2000 to April 30, 2001;

Section 3. (A). A trust to be known as "Carpenters Pension and Annuity Fund of Philadelphia and Vicinity" (referred to hereinafter as the "Pension Fund") shall be established and maintained for the purpose of providing (out of the monies paid into said Fund and out of the income from the investment of said monies) such program of pension or annuity benefits for the sole and exclusive benefit of employees and other "Participants" mentioned in the Agreement and Declaration of Trust hereinafter mentioned, as the Council may from time to time determine in conformity with limitations contained in said Agreement and Declaration of Trust.

(B). The Agreement and Declaration of Trust created for the purpose of establishing and administering the Pension Fund shall provide that no compulsory retirement may be required; shall contain, inter alia, provisions identical (except in that they shall refer to the Pension Fund) with clauses (1) through (9) of Section 3 (b) of Article 16 (as contained in the Memorandum of Understanding attached as Schedule "E") and shall, in all other respects, be as nearly identical as possible with the provisions of the Agreement and Declaration of Trust creating the Carpenters Health and Welfare Fund of Philadelphia and Vicinity.

## 25

### ARTICLE 18

### Work Dues and Jobs Recovery Dues Check-offs and Union Security

Section 1.

Each Employer shall deduct from the wages of all employees who are covered by this Agreement and who have signed and delivered to the Employer proper legal authorizations for such deductions, work dues check-offs in the amounts as certified by the Council and delivered to the Employer as being due and owing.

In addition to the work dues, the Employer shall also deduct from the wages of each Employee covered by this Agreement, a sum as certified by the Council (for each hour worked under this Agreement) as Jobs Recovery Dues. Said dues shall be remitted to the Council simultaneously with, and in the same manner as, the dues otherwise described in this Article and shall be subject to the provisions of this Agreement dealing with the delinquent payment of monies, including the delinquent dues payable to the Council, by the Employer.

Section 2.

Each such Employer shall, within ten days after the end of each Payroll Week, transmit to the Depository, as provided in Article 16, Section 1 hereof, amounts deducted during such Payroll Week pursuant to Section 1 of this Article 18, together with the Employer's report of said deductions, which report shall be on the same form as is used by the Employer for reporting payments due to the Employer as contributions made pursuant to Articles 5, 16, 17, 22, and 23 hereof. The collection procedures for the work dues check-offs provided above shall be in accordance with the procedure outlined in Article 19, and for delinquent payments shall include, in addition to principal sums due and owing, ten percent (10%)

28

# ARTICLE 19

## Delinquency and Collection Procedure

**Section 1.** The provisions of this Article shall apply with equal force and effect to the contributory and withholding obligations set forth in Article 5 (Joint Apprentice Committee), Article 16 (Health and Welfare Fund-Industry Advancement Program), Article 17 (Pension and Annuity Funds), Article 18 (Work Dues and Jobs Recovery Dues Checkoffs), Article 22 (Political Action Committee) and Article 28 (National Apprenticeship and Health and Safety Fund).

**Section 2.** All payments shall be remitted to the depository designated herein on Report Forms designated, as appropriate, by the Funds or Council. In the event that the report accompanying any payment made to the Depository pursuant to Article 5 (Joint Apprentice Committee), Article 16 (Health and Welfare Fund-Industry Advancement Program), Article 17 (Pension and Annuity Funds), Article 18 (Work Dues and Jobs Recovery Dues Checkoffs), Article 22 (Political Action Committee) and Article 28 (National Apprenticeship and Health and Safety Fund) of this Agreement shows that the full sum as therein required is not paid, or is not intended to be paid, then the Depository shall dispose of said payment by distributing to each party such portion of the remittance in proportion to the fraction that each such recipient's hourly remittance bears to the total hourly remittance required by this Agreement.

**Section 3.** To the extent that an employee has not performed Covered Employment during the reporting period, the Employer shall so advise the Funds of that fact in the line and by the method otherwise provided for the remittance of contributions herein.

29

**Section 4 (A).** Except as otherwise specifically provided herein, payments not received by the 10th day following the payroll week which the Report covers shall be considered "delinquent" for purposes of this Agreement.

**(B).** If the Trustees of the respective Funds, in their sole discretion, determine that an Employer has a satisfactory record of timely payments, the Trustees may notify such Employer in writing that his payments into the respective Funds will be required by the 15th day following the end of each calendar month, which shall be the "Due Date."

**Section 5.** Payments received by the Fund or Council later than ten (10) days after the due date shall incur and shall include a liquidated damages charge equal to ten percent (10%) of the gross amount due each Fund or Council if submitted after the due date.

**Section 6.** In addition to the liquidated damages charge provided for above, the alleged failure of the Employer to make payments when due or payments received later than ten (10) days after the due date shall subject the Employer to one or more of the following actions:

**(A).** As otherwise described in Article 14, the Council shall have the right to withhold employees covered by this Agreement until all sums due (including liquidated damages) are paid. If such action shall, in the discretion of the Council, prove necessary or desirable, the employees whose labor is thus withheld, shall be paid their wages and fringe benefits for all time lost pending payments by the Employer as provided in Article 14.

30

**(B).** The appropriate Funds and/or Council may institute formal collection proceedings that may include but are not limited to the institution of legal action against the Employer, to secure, and if necessary, to compel payment of the monies described herein. In the event that an Employer is delinquent in the payment of contributions, the Employer shall pay (in addition to the principal sums due and the ten percent (10%) liquidated damages) interest calculated in accordance with ERISA, all costs of suit (including reimbursement for Fund administrative time) and attorneys' fees and costs, regardless of whether suit or other formal proceedings are instituted.

**(C).** The appropriate Funds and/or Council shall notify the Bonding Company 20 days after the Due Date of the delinquency and institute suit on the bond.

**Section 7.** The Employer shall, simultaneous with the remittance of monies described herein, transmit to said Depository, a report containing (1) the names and Social Security numbers of the persons to whom this Agreement is applicable, who have been in the employ of the Employer during such payroll week; (2) the number of hours during said payroll week for which wages of any type-compensation are payable under this Agreement; and (3) such other information as the Boards of Administration of the Funds herein provided for may reasonably require for the proper administration of said Funds.

**Section 8. Surety Bonds.**

**(A).** The payments to be made and, where appropriate, monies to be withheld, as provided in Article 5 (Joint Apprentice Committee) Article 16, Section 2 (Health and Welfare Fund - Industry

31

Advancement Program), Article 17, Section 2 (Pension and Annuity Funds), Article 18 (Work Dues and Jobs Recovery Dues Checkoffs), Article 22 (Political Action Committee) and Article 28 (National Apprenticeship and Health and Safety Fund) of this Agreement shall be guaranteed and secured in the following manner:

(i) The Association hereby agrees with respect to each Employer who employs employees covered by this Association represents in collective bargaining at the time of the execution of this Agreement, or whom it shall begin so to represent after the execution of this Agreement, that the Association will, not more than thirty (30) days after the execution of this Agreement, execute and deliver to the Trustee a undertaking, in the form of a Bond, that, upon certification to it by the Trustee that any such Employer is in default in any such payment and that such payment is past due by more than thirty (30) days, then, if the obligation is not satisfied within fifteen (15) days after such certification, the Association, out of the funds of the Industry Advancement Program, shall pay unto the Trustee the amount in default up to, but not exceeding Forty Thousand Dollars ($40,000.00), and in such event the Association is hereby granted all subrogation rights for the purpose of recovering from the delinquent amount so advanced in or in its behalf out of the Industry Advancement Program under said Bond. No assets of the Association, other than the assets of the Industry Advancement Program hereinafter provided for, shall be looked to for the fulfillment of the

foregoing undertaking. Notwithstanding the next preceding two sentences, the Association may, as it sole option and discretion, at any time substitute the Bond of an Employer, with a recognized responsible corporate surety in fulfillment of its obligations under the next preceding two sentences and pay the premium for such bond out of the assets of said Industry Advancement Program.

(ii) The Council agrees that it may include in any collective bargaining contract with an Employer for whom the Association does not act as the collective bargaining representative, if said contract covers the same work and jurisdiction as covered in Article 2 of this Agreement, provisions requiring such Employer to make the same payments to the Depository as are required by subsection (A) of this Section 8, and to guarantee the making of such payment by the Bond of a recognized and responsible corporate surety. In the event that any such Employer shall furnish the Bond of a corporate surety, the Association shall, out of the funds of said Industry Advancement Program, pay the premium for such Bond, provided such premium is in a reasonable amount; if such premium shall be in an amount greater than usually charged for such Bond, such Employer shall, himself, pay the difference between Five Hundred Dollars ($500.00) and the amount of said premium, and the Association shall pay, out of the funds of the Industry Advancement Program, Five

32

Hundred Dollars ($500.00) of said premium.

(B). If the Association, pursuant to Section 8(A), elects to furnish its own undertaking in the form of a Bond, limiting its liability thereunder to Industry Advancement Program assets only, such undertaking shall continue thereafter until the Association, upon certification by the Trustee to the Association that any Employer is in default in the payments required of him by this Section 8, such undertaking shall continue to assure payments required of said Employer by this Section 8 to an amount of Forty Thousand Dollars ($40,000.00) over and above the amount of such payments in default. If the Association exercises its option to substitute for its own surety in fulfillment of its obligations under the clause (i) of subsection (A) of this Section that any certification by the Trustee to the Association that any Employer is in default in the payments required of him by this Section 8, the Association shall furnish its undertaking limited to the assets of the Industry Advancement Program, to assure payments required of such Employer to an amount of Forty Thousand Dollars ($40,000.00) over and above the amount of such payments in default.

(C). Every Employer and every other employer who is a party to another collective bargaining agreement with the Council covering the same work and jurisdiction as specified in Article 2 of this Agreement, in the event such Employer or such other employer is required to give surety as provided in clause (ii) of subsection (A) of this Section 8, shall upon certification to him and to the Council by the Trustee, that such Employer or other employer is in

33

default in the payments required of him by this Section 8, furnish further corporate surety to assure payment as required under this Section 8 by such Employer or other employer to an amount of Forty Thousand Dollars ($40,000.00) over and above the amount of such payments in default, or, in the alternative, shall deposit with the Trustee as collateral security for the faithful performance of his own Bond assuring said payments, a further amount in cash or in securities acceptable to the Trustee, sufficient to restore such collateral security to an amount of Forty Thousand Dollars ($40,000.00).

(D). Notwithstanding anything to the contrary contained in this Section 8, the Association shall not be required during the term of this Agreement:

(i) If Association does not elect to post Bond, to pay an amount exceeding Forty Thousand Dollars ($40,000.00) with respect to single Employer required to make contributions under this Agreement following default by such Employer, or

(ii) If Association elects not to post bond, to pay any amount whatsoever, whether for Bond premiums or otherwise, with respect to a single employer required to make contributions under this Agreement following default by such employer, or

(iii) To pay any amount on account of Bond premiums with respect to a single Employer required to make contributions under this Agreement following default by such Employer.

Section 9. Prior to entering into any subcontract for work covered by this Agreement, the Employer will verify with the Fund that the proposed subcon-

34

tractor has a signed Agreement and has posted the fringe benefit bond required under this Agreement. After the Employer has contacted the Fund, the Fund will inform the Employer in writing within 72 hours if the proposed subcontractor does not have a fringe benefit bond, and/or an Agreement. The Employer will not enter into a subcontract until the subcontractor has posted a bond and signed an Agreement.

The Employer agrees that, upon written notice from the Fund that its subcontractor is delinquent in the payment of fringe benefits on his particular project, the Union, the subcontractor, and the Employer shall meet to resolve said delinquency. In the event that satisfactory arrangements to collect the delinquency are not made, a jointly payable check in the amount of said delinquency shall be issued to the Funds by the Employer. This will not preclude the Union from exercising its rights provided in Article 14.

Section 10. Estimated payments in advance for all payments (except wages) required under this Agreement will be made by the Employer if it has failed to demonstrate in the sole and exclusive judgment of the Council, a current record of timely payments with the Funds.

Section 11. The Employer shall also, upon request of any agent or delegate of the Board of Administration, permit such agent during regular business hours to inspect and make copies of any and all records of the Employer pertaining to compensation paid to employees, hours worked by employees, monies withheld from employees for taxes paid on account of employees, and all other records relevant to, and of assistance in determining the Employer's obligations hereunder to make payments to the Depository have been faithfully performed. If such inspection and/or

35

## 36

audit reveals that the Employer failed to make payments in full, the Employer shall be required to pay for the cost of such inspection and/or audit at the rate of One Hundred Dollars ($100.00) per day as well as any additional monies provided for herein.

### ARTICLE 20
### Surveying and Lay-Out Work

*Section 1*

In order to clarify the contract coverage with respect to construction lay-out work, the term "any work" appearing in the Agreement includes, as work assigned to Carpenter Journeymen, Carpenter Apprentices and Carpenter Foremen, all line and grade work, both before and after construction begins, and during the course of construction, consisting by way of example but not of limitation, of all the tasks of lay-out; the setting of vertical and horizontal controls as a necessary before construction work begins; the setting of grades and elevations; the setting of vertical and horizontal controls on various floor levels; the lay-out of center lines; the establishment of all measurements and levels; and the establishment of curb lines, axis lines, partition lines, etc.

Lay-out tasks may be performed to the same extent, and under the same circumstances as in the past, by the Employer, or if the Employer is a corporation or partnership, by the executive officers or partners of the Employer and by the Employer's management personnel, superintendents and foremen.

Management Personnel is defined to be those persons:

(a) In a management capacity higher than a superintendent.

## 37

(b) It is understood that, as in the past, (1) the Employer has the right to subcontract the initial lay-out work to professional surveying firms, and also subcontract continuing lay-out work to professional surveying firms provided, however, that such continuing lay-out work shall be performed under the terms and conditions of our Agreement; and (2) that the Union will in no manner interfere with any initial lay-out of lines and grades outside the direct control of the Employer, or interfere with the work of City, County or other governmental surveyors performing lay-out work for any such governmental agency as its employees.

In any case where (1) an Employer has subcontracted continuing lay-out work to professional surveying firms or (2) any Employer utilizes, under the same circumstances, continuing lay-out work done in the past, a lay-out crew, the following shall pertain, subject to all other provisions of our Agreement (including the "Union Security" clause as contained in Article 18, Section 4):

A. The Employer or the professional surveying firm, as the case may be, shall have the right to determine the size and make-up of the lay-out crews.

B. Nothing shall prevent a member of a lay-out crew who is performing one category of lay-out work from temporarily performing another category of lay-out work for reasonably short periods of time, provided that such temporary assignment shall not affect his rate of pay.

C. The rates of pay for members of a lay-out crew shall be as follows:

## 40

by a court of last resort, such part shall be declared null and void.

### ARTICLE 22
### Political Action Committee Check-Off

*Section 1*

Each Employer shall deduct from the wages of all employees who are covered by this Agreement and who have signed and delivered to the Employer per legal authorizations for a check-off deduction for each hour worked to the Carpenters' Political Action Committee of Philadelphia and Vicinity in such amount as certified by the Council as having been authorized by such employees.

*Section 2*

Each such Employer shall, within ten (10) days after the end of each Payroll Week, transmit to the Depository as defined in this Agreement amounts deducted during such Payroll Week pursuant to this Article, together with the Employer's report of deductions, which report shall be on the same form as is used by the Employer for reporting payments due by the Employer as contributions made to the Health and Welfare and Pension Funds.

### ARTICLE 23
### Most Favored Nation Clause

It is understood that if the Council enters into any Agreement with any Contractor or Association engaged in commercial, industrial or institutional construction which contains terms herein upon more favorable terms to such other Contractor or

## 41

Association than are embodied in this Agreement between the General Building Contractors Association (GBCA) and the Concrete Contractors Association (CCA) and the Council, then this Agreement shall be amended so as to afford to GBCA and CCA and their members the same more favorable terms; provided, however, that this clause shall not restrict the ability of the Union to agree to modifications of this Agreement with any Employer or Employers which the Union has knowledge are bidding any project on which there is non-union competition.

This Article shall apply solely and exclusively to Active and Associate Members of GBCA and CCA, and continued membership in GBCA and CCA is a prerequisite to its continued application. In the event that a GBCA and CCA member cease membership within GBCA and CCA, then upon such cessation the provisions of this Article shall be null and void to that Employer with respect to previous past, present, or future adjustments.

### ARTICLE 24
### Pre-Job Conference

On all jobs over One Half Million Dollars ($500,000.00), either party may call for a pre-job conference.

### ARTICLE 25
### Labor Saving Machinery

There shall not during the life of this Agreement be any restriction on the use of machinery or labor saving devices used in the carpenter work on the building. If any machinery or labor saving devices are used, same shall be furnished by the Employer and operated by the employees.

438 2⁰
p 22/

## AGREEMENT WITH THE
## METROPOLITAN REGIONAL COUNCIL
## OF PHILADELPHIA AND VICINITY
## UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA

THE METROPOLITAN REGIONAL COUNCIL OF PHILADELPHIA AND VICINITY, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA ("COUNCIL") and the Undersigned Employer agree that:

1. The employer shall be and is hereby, bound by all of the terms and conditions of employment contained in the collective bargaining agreement between the Council and the General Building Contractors Association, Inc. ("GBCA"), receipt of a copy of which is hereby acknowledged, that is effective on the date of this Agreement as well as any additions, modifications, extensions and renewals thereof between the Council and GBCA as may occur subsequent to the execution of this Agreement.

2. This Agreement shall be effective as of the date set forth below and shall remain in full force and effect for the duration of the collective bargaining agreement between the Council and General Building Contractors Association, Inc. that is effective on the date of this Agreement and for the duration of any addition, modification or renewal thereof until one party shall provide to the other written notice by certified mail of intent to terminate the then-current agreement at its stated expiration date that shall actually be received by the other party not later than ninety (90) days prior to the stated expiration date of that then-current Agreement.

3. In the event that a successor agreement is not negotiated between the Council and General Building Contractors Association, Inc. by the end of its stated duration, the employer agrees to pay all wages and fringe benefits, and to pay any increase in the collective bargaining agreement agreed to between the Metropolitan Regional Council of Carpenters and General Building Contractors Association, Inc. to the first day of the Successor Agreement.

4. If there should be a work stoppage, the undersigned employer agrees to deduct two hours gross pay per day from each of it's union employees permitted to work while a strike is in progress. The employer will forward these payments to the Metropolitan Regional Council, payable to the "Strike and Defense Fund", each week during the period of any work stoppage (if such stoppage should occur) in compliance with Section 55(B) of the United Brotherhood of Carpenters & Joiners of America.

METROPOLITAN REGIONAL COUNCIL OF
PHILADELPHIA AND VICINITY

_____
EDWARD CORYELL
Secretary-Treasurer

PHX Services Inc.
Insert Full Name of Employer

_____
Signature of AUTHORIZED
Employer Representative

320 W. Red Avenue
Address

Cashdocken PA   19428
City          State     Zip

April 19, 1999
Date

# EXHIBIT 3

# AGREEMENT

### between the

## INTERIOR FINISH CONTRACTORS ASSOCIATION OF DELAWARE VALLEY



INTERIOR FINISH CONTRACTORS ASSOCIATION
OF DELAWARE VALLEY
MASTER PLASTERERS COMPANY, A DIVISION OF IFCA

### and the

## METROPOLITAN REGIONAL COUNCIL of PHILADELPHIA and VICINITY



## UNITED BROTHERHOOD of CARPENTERS and JOINERS of AMERICA

**Effective May 1, 1997 Through April 30, 2001**

Counties of Philadelphia, Bucks,
Montgomery, Chester, Delaware, Lehigh,
Northampton and Carbon

---



*Look For This Label On All Woodwork*

## METROPOLITAN REGIONAL COUNCIL of PHILADELPHIA & VICINITY

1803 Spring Garden Street
Philadelphia, PA 19130

— Office Telephone —
215-569-1634
FAX 215-569-0263

## INTERIOR FINISH CONTRACTORS ASSOCIATION OF DELAWARE VALLEY

G. S. B. Building
Belmont & City Line Avenues • Suite 710
Bala Cynwyd, PA 19004
610-668-0880
FAX 610-668-4166



INTERIOR FINISH CONTRACTORS ASSOCIATION
OF DELAWARE VALLEY
MASTER PLASTERERS COMPANY, A DIVISION OF IFCA

---

# INDEX

|  |  | Page |
|---|---|---|
| Article 1 | Articles of Agreement | |
| Article 2 | Term of Agreement | 1 |
| Article 3 | Recognition | |
| Article 4 | Working Hours and Holidays | 1 |
| Article 5 | Wage Rates | |
| Article 6 | Apprentices | 1 |
| Article 7 | Shift Work | 1 |
| Article 8 | Out of Town Employment | 1 |
| Article 9 | Reporting for Work | 1 |
| Article 10 | Tools: Storage - Loss | 1 |
| Article 11 | Work Jurisdiction | 1 |
| Article 12 | Working Rules | 1 |
| Article 13 | Sub-Contractor Clause | 1 |
| Article 14 | Hiring Procedures | 2 |
| Article 15 | Settlement of Disputes | 2 |
| Article 16 | Council's Business Representatives | 2 |
| | Health and Welfare Fund and Industry Advancement Program | 2 |
| Article 17 | Pension and Annuity Plan | 2 |
| Article 18 | Work Dues and Jobs Recovery Dues Check-Offs | 2 |
| Article 19 | Delinquency and Collection Procedure | 2 |
| Article 20 | Carpenters/Association Joint Committee | 3 |
| Article 21 | Legality | 3 |
| Article 22 | Political Action Committee Check-Off | 3 |
| Article 23 | Most Favored Nation Clause | 3 |
| Article 24 | Pre-fit Doors | 3 |
| Article 25 | Drug Testing Policy | 3 |
| Article 26 | National Apprenticeship and Health and Safety Fund | 3 |
| Article 27 | Pre-Job Conference | 4 |
| Schedule "A" | I.F.C.A. Members | 4 |
| Schedule "B" | Standards of Apprenticeship for the Carpentry Trade | |
| Schedule "C" | Working Rules | |
| Schedule "D" | Apprentice Wage Rates | |
| Exhibit "E" | Wage-Fringe Schedule | |
| Exhibit "F" | H&W Memorandum of Understanding | |
| Exhibit "G" | IAP Memorandum of Understanding | |
| Exhibit "H" | Acceptance of Agreement | |
| LATHERS' SUPPLEMENTAL AGREEMENT | | |

---

**1**

## ARTICLES OF AGREEMENT

This Agreement, by and between the Interior Finish Contractors Association (hereinafter referred to as the "Association"), acting for and on behalf of itself and, pursuant to authority duly granted, for and on behalf of each of its present and future members who have assigned bargaining rights to the Association (individually hereinafter referred to as the "Contractor" or "Employer") and for any other Employer who is not a member of the Association, but who agrees to be bound hereto by signing Exhibit H (Employer's Acceptance of Agreement) and the METROPOLITAN REGIONAL COUNCIL OF PHILADELPHIA AND VICINITY of the UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, (hereinafter referred to as the "Union" or the "Council"), acting for and on behalf of the United Brotherhood of Carpenters and Joiners of America, located and having jurisdiction in the Counties of Philadelphia, Delaware, Montgomery, Chester, Bucks, Lehigh, Northampton and Carbon, in the Commonwealth of Pennsylvania and of their present and future members, and of other employees (as hereinafter defined) of the Employer.

## WITNESSETH:

## ARTICLE 1
### TERM OF AGREEMENT

(a) This Agreement shall be binding upon both parties hereunto, and upon the respective successors and assigns of said parties for the period beginning May 1, 1997 and ending at Midnight of April 30, 2001 without change or modification except as hereinafter specifically provided, and thereafter from year to year,

**2**

unless either party hereto shall notify the other in writing at least ninety (90) days prior to the expiration of the term, or of any extended term, of this Agreement of an intention to change or amend any of the provisions of this Agreement upon expiration of its term or of any extended term thereof. Such notice shall be served by certified mail postmarked not less than ninety (90) days prior to such expiration date.

(b) Should either party give notice to the other as aforesaid, then, within thirty (30) days after the mailing of said notice, representatives of the Association and of the Council shall meet to discuss, negotiate, and agree upon such changes. If no agreement as to such changes is arrived at before the expiration of the term or of any then current extension of the term, of this Agreement, then the whole of this Agreement shall be considered terminated upon the expiration of the term, or of the then current extension of the term of this Agreement, unless extended by mutual agreement in writing of the parties hereto.

## ARTICLE 2
### RECOGNITION

(a) The Association hereby recognizes the Union as the bargaining agent for its members and for the work described in Article 10, and on the behalf of itself and each of its member-employers who have assigned bargaining rights to the Association, is authorized to bargain on their behalf, in executing this Agreement, and agrees to work the hours, pay the wages (including payments to fringe benefit funds) and observe the working conditions established or agreed upon by the Union and the Association, in the respective area in which any of its work is performed, with respect to foremen, journeymen carpenters and apprentices. The Union recognizes this Association of

**3**

Contractors on behalf of its members for collective bargaining purposes. This agreement applies but is not limited to all of the work described in Article 10 - Jurisdiction.

(b) Notwithstanding any other provision of this Agreement to the contrary, in the event that an Employer bound hereby shall perform work within the meaning of this contract within Lehigh County, Northampton County and Carbon County, then all such work shall be performed in accordance with the terms and conditions of the Collective Bargaining Agreement then in effect between Carpenters Local Union #600 and the Lehigh Valley Contractors Association, Inc.

(c) To protect and preserve, for the employees covered by this Agreement, all work they have performed and all work covered by this Agreement, and to prevent any device or subterfuge to avoid the protection and preservation of such work, it is agreed as follows:

If the contractor performs on-site construction work of the type covered by this Agreement, under its own name or the name of another as a corporation, company, partnership, or other business entity including a joint venture, where the contractor through its officers, directors, partners or owners exercises directly or indirectly management control, the terms of this Agreement shall be applicable to all such work.

## ARTICLE 3
### WORKING HOURS AND HOLIDAYS

(a) The Regular or normal work week shall consist of forty (40) hours, and regular or normal hours and

**6**

(b) The minimum "straight time" rate of pay for regular day shift hours for Foremen shall be not less than fifteen per cent (15%) above the Journeymen-Carpenters' wage rate.

(c) Not more than one (1) Foreman from outside the territory covered by this Agreement shall be employed on any one project.

(d) All employees shall be paid weekly, before quitting time and on the job site in cash; provided, however, that payment may be made by check in any case where an Employer posts a bond or cash in an amount sufficient to cover its payroll or the Council waives such bonding requirement in writing where it is satisfied concerning the financial responsibility of the Employer. The Employer shall have the option of withholding no more than three (3) days' pay. When an employee is required to wait after quitting time for his pay, he shall be paid four hours pay for the initial designated pay day and eight hours additional for each additional day he is required to wait (including four hours pay for Saturdays, Sundays and Holidays). Employees shall not be required to work until all wages due are paid in full.

The foregoing provisions of Section (d) shall apply except where the Employer proves that due to an Act of God, robbery or an accident, it was not possible to comply with said provisions. In such cases, the matter will be dealt with in accordance with Article 14 (the grievance procedure).

(e) An itemized statement shall be included in any pay envelope or upon check stub. Said statement shall show gross income, deductible items, and the net amount. This statement or check stub to be retained by employee.

**7**

(f) Upon thirty (30) days written notice to the Association, the Council may in its discretion determine that:

(1). a portion of the wages provided herein shall thereafter be paid to the fringe benefit funds provided in Article 5 (Joint Apprentice Committee), Article 16 (Health and Welfare Fund) and Article 17 (Pension and Annuity Fund) as if fully set forth in that Article; or

(2). the existing Employer contributions to those aforementioned Funds otherwise provided in the Agreement shall be amended between and among those Funds in such manner as the Council should deem appropriate, provided only that such reallocation of fringe benefit contributions shall not substantially impair the financial or actuarial soundness of the affected Funds.

## ARTICLE 5
## APPRENTICES

All Employers shall participate in the apprenticeship training program and employ apprentices as directed by the Carpenters Joint Apprenticeship Committee of Philadelphia and Vicinity.

The straight time rate of pay of an apprentice during each six-month period of his apprenticeship shall be as outlined in Schedule D, and are as set forth in Section (a) of Article 4 and in Article 6 of this Agreement, which are set opposite to such period in the following table:

**8**

| SIX MONTH PERIOD | PERCENTAGE OF JOURNEYMAN'S STRAIGHT TIME RATE |
|---|---|
| First | 40% |
| Second | 46% |
| Third | 52% |
| Fourth | 58% |
| Fifth | 64% |
| Sixth | 72% |
| Seventh | 80% |
| Eighth | 88% |

The employment of apprentices shall be in accordance with the terms and conditions of the Standards of Apprenticeship, heretofore adopted, and as amended by the aforesaid Committee, and in accordance with the rules and regulations governing apprentices and their tools as set forth and provided by the Carpenters Joint Apprentice Committee.

It is hereby confirmed that the authority of said committee includes the authority to amend the Standards of Apprenticeship to include, or to adopt, a rule or regulation, which, when adopted, shall be binding upon the Employer.

All apprentices shall attend day school classes as part of their training and shall be paid an educational grant by the Employer.

The Committee shall make the apprenticeship training program available to the Employer under this Agreement, and said Employer shall be obligated to pay to said Committee or its designee such amount as the Committee shall determine to be proper and in

**9**

proportion to the cost of training apprentices employed on commercial, industrial or institutional building construction. Payments shall be made in the manner designated by the Committee.

## ARTICLE 6
## SHIFT WORK

(a) The period of work or shift whose regular hours fall completely between the hours of 7:00 A.M. and 5:30 P.M. shall be known as the day shift, and a period of work or shift whose regular hours embrace any portion of the period between the ending of the day shift of one day and the beginning of the next succeeding day shift shall be known as an extra shift. When the Employer requires an extra shift or shifts, he shall apply to the Council's office or to the Business Representative of the Council for the area in which the job is located, for permission to institute such extra shift or shifts.

(b) The rate of pay for work on an extra shift for the first five days of the regular work week as above specified, (hereinafter referred to as the "extra shift rate") shall be ten per cent (10%) above the rates specified in Article 4 Sections a, b and Schedule "D" of this Agreement. It is understood that where, in accordance with the provisions of Article 3 (b) and (c), an extra shift has been established which begins after the day shift, only the extra shift rate need be paid for the first eight (8) hours of work on such shift on a Friday, despite the fact that such eight (8) hours will end after Midnight on Friday; work on such shift after midnight of the day preceding a holiday shall, however, be paid for at twice the extra shift rate.

**12**

## ARTICLE 9

### TOOLS: STORAGE - LOSS

(a)  The Employer shall provide a safe place for tools.

(b)  The employee may supply, at the time of hiring, a list of all personal tools which he has brought to the job. The Employer may review the list and may limit the number and type of tools which the employee has on the job.

The Employer shall reimburse each employee for any of his tools which are destroyed on the project site by fire or other act of God, or which, while the project is not operating are lost, stolen, destroyed or damaged on the project site, or the Employer may, at its option, replace such tools with the same make and model tools, or equal; provided that if the Employer has complied with the provisions of Section (a) above, he shall be liable for such loss or injury only if it occurs while such tools or clothing are in the place designated by the Employer for storage; and provided further, that the Employer liability if no list is provided, shall be limited to not more than $400.00 for any single loss or injury to tools, and not more than $100.00 for any single loss or injury to clothing; provided further that after the employee has supplied the tool list described herein, this limitation of liability shall not apply, and the employee shall receive reimbursement for or replacement of all listed tools. The employee must supply a list if the Employer requests one.

The Employer will reimburse the employee for such loss or replace the tools and clothing not later than three (3) days after the employee furnishes the Employer with the properly sworn itemized statement of loss.

**1**

## ARTICLE

### WORK JURISDICT

The Employer shall recognize the Jurisdiction of Union, including but not limited to Carpentry, wrighting, Wharf and Dock Building, Floorlaying per Local 1823 Agreement) and Lathing. The pa hereto agree to be bound by the following jurisdiction, including but not limited to:

### SECTION 1

The unloading, stock-piling, general distribution specific distribution to point of erection or installat the carrying, handling, transportation (regardles packaging or protection), the demolition and repl ment of, the erection of, the cleaning, and touch-uj all Ceiling Materials, all types of component part all types of Ceiling, all Metal-Pan Ceilings, ins Grid Systems . . . regardless of their materia composition or method or manner of installat attachment or connection; cross furring, stiffen braces, all bars regardless of material or metho attachment; all integrated gypsum wallboard c heat panels, all radiant heat ceiling backing, all tees, all cross tees, all splines, all wall and c angles or moldings, all backing board and insul and all finish ceiling materials, regardless of meth manner of installation; and all layout work, inclu the use of a level, transit, laser, and any instrument or tool in use or adaptable to the herein.

### SECTION 2

(a)  All work in connection with the unloa carrying, transportation, handling, stocking, dist tion, installation, erection and/or application o gypsum board and of all dry wall materials, regar

**14**

of composition, and regardless of the method or manner of their installation, attachment or connection, including but not limited to all floor and ceiling runners, studs, stiffeners, cross bracings, fire blocking, resilient channels, furring (including metal framing and grilles), including frames, casing, molding, base systems); pre-finished panels (including vinyl-covered gypsum board) for interior or exterior use, corrugated metal wall panels, movable partitions, regardless of composition and accessories, the handling of all these items regardless of the packaging or protection used; backing board for all systems (including but not limited to thin coat and other finished systems); plastic and/or paint finished bases, finish board; fireproofing of beams, columns, and chases, (except sprayed on); rigid, sound and thermal insulation materials, also insulation used for the purposes, but not limited to, firesafing, soundproofing, thermal etc.; fixture attachments, preparation of all openings for lighting, air vents or other purposes.

(b)  All work in connection with the handling, cutting, fitting and installation of gypsum board, to be used as insulation and/or as a fire retardant on field-assembled insulated metal panels. All work in connection with the handling, cutting, fitting, and installation of gypsum board which may be used for supply duct, shaft walls, exhaust duct and bathroom ventilation risers (including metal framing and grilles), and categories of the purpose, type or method or manner of installation, attachment or connection (free standing or connected); all layout work including the use of the level, transit, laser, and any other instrument or tool in use or adaptable to the work herein described in this Section 2. All clean up of work area, removal of scrap and waste material, and all other necessary or related work in connection therewith including the installation of all trash chutes.

**15**

(c)  The Carpenter's work jurisdiction concernin the unloading of unfinished gypsum drywall an insulation materials as described in this Section 2, an cleanup, shall be performed in accordance with th past tradition as previously performed by th individual contractor.

(d)  This Agreement covers all work in connection with the installation and erection of all temporar protection, dust-proof partitions, enclosures, etc. required for the proper removal and disposal o asbestos products.

### SECTION 3

No limitation shall be placed on the work covered by this Agreement by reason of the surface o texture or purpose for which the materials describe herein are used, designed, or intended.

### SECTION 4

It is understood that the installation and attachmen of the miscellaneous iron and steel to serve as suppor systems pertaining to any work outlined in thi Agreement shall be done by the Employees covered under this Agreement. It is further understood that th installation, fastening, and connection of all types o light iron and metal studs, interior and exterior ligh gauge steel, framing, and all types of framing regardless of composition, erected to receive th materials specified in this Agreement, including bu not limited to gypsum wallboard (plain, vinyl-covered sheet-lead lined), walls, partitions, ceiling heat panels backing boards, plastic or acoustical materials, or an material attached to the above described construction is specifically included in the work covered by thi Agreement if it is included in the Employer's contract

**16**

## SECTION 5

All work pertaining to the unloading, handling, stock-piling, distribution (regardless of the packaging or protection used) of all floor materials, installation, fabrication, and application of elevated, raised or access floor systems, including trim members, ramps, steps, facias, perforated and grilled air panels, table cut-outs; and other necessary or related work for the installation of all accessories related to laying, scraping and sanding, either by machine or by hand, and the finishing; all wood parquet and special designs of wood, wood blocks, wood composition, metal, tile, cork, asphalt, mastic, whether nailed or applied with adhesives; and all layout work, including the use of the level, transit, laser, and any other instrument or tool in use or adaptable to the work herein.

## SECTION 6

(a) All work pertaining to the unloading, handling, stock-piling, distribution (regardless of the packaging or protection used) of all materials for the preparation, fabrication, installation, and/or erection in all structures of all interior and exterior work made of wood, wood pulp, aluminum, metal, plastic, transite, porcelain, enamel, composition materials (or any other combination); and also including but not limited to toilet room partitions, vanities and accessories; cabinets, cases, store displays, fixtures, seating, stairs, walk-in coolers, refrigerators and environmental rooms, laboratory equipment, dressers, wardrobes, china closets, ornamental work, panel work, wainscoting, partitions, showcases, wallcases, doors, jambs, trim, hardware, moldings, including but not limited to wood, metal, vinyl-clad, etc., or made of any type composition or material being used for any installation, metal bucks, doors and partitions, draperies, curtains, curtain pockets, blinds, venetian blinds, blackboards, bulletin boards and bowling

**17**

level, transit, laser, and any other instrument or tool in use or adaptable to the work described herein.

(b) Windows: All work pertaining to the unloading, handling, stock-piling, distribution (regardless of the packaging or protection used) of all materials for the preparation, fabrication, installation, and/or erection in all structures of all windows, window sash, transoms, trim, hardware, moldings, capping, screens, interior and exterior storm windows, pre-glazed windows; the removal and preparation for replacement windows and all parts and attachments pertaining to the installation of replacement windows; the layout and framing for the openings for all window installations regardless of the method or manner or type of installation; and, all of the above includes but is not limited to wood, metal, vinyl-clad windows, or windows made of any type composition or material for any type of window installation.

Specifically, all window frames and windows placed in or attached to wood, or attached by any means to metal studs (no matter what size stud or the gauge of the metal), it is the work of the Carpenters to install the frames and windows in their entirety.

## SECTION 7

(a) The unloading, carrying, transportation, handling, stock-piling, installation, strapping, erection, and/or application of all materials and component parts of all types of overhead type, rolling and roll-up, sectional, upward acting, uprising, vertical lift, Bi-Parting, canopy, multi-sectional, sliding, swinging, folding Garage Doors, regardless of their materials or composition, method or manner of installation, attachment or connection, (plus the opening and closing devices and machinery for the operation of all these types of doors and all the miscellaneous steel parts and attachments pertaining to the installation of these

**18**

doors, if included in the Employer's contract); including but not limited to all track, sections, trussing, hanging supports, braces, regardless of material or method of attachment, all integrated insulation, windows and glazing, jambs, astragals, framing, regardless of method or manner of installation, the use of all equipment, including the use of the watertype level, electric manual hoist, come-a-long, roto hammer, gas driven generator, electric or gas-powered welders, burning equipment, and any other instrument or tool in use or adaptable to the work herein described; plus all layout work, including the use of the level, transit, and laser. Also, the erection and dismanting of scaffolding required for the performance of all work described in Article 10 shall be the work jurisdiction of the Council.

The unloading, transportation, handling, stock-piling, installation, erection and layout of all interior and exterior signage, including but not limited to entrance and exit signs, room and floor designations, personnel signage, institutional signage, directional signage, etc., shall be the work jurisdiction of the Carpenters, if the work is included in the Employer's Contract.

(b) The Employer agrees that any work of the nature set forth in this Article 10 of this Agreement, performed by or for the Employer, is and shall be assigned by the Employer to employees covered hereby and represented by the Council, and further agrees to recognize and observe the jurisdiction rights and claims of the United Brotherhood of Carpenters and Joiners of America, the Council, and employees represented by them, to such work as such rights and claims heretofore have been or hereafter may be determined.

## SECTION 8

All work in connection with the unloading, han-

**19**

dling, stock-piling, distribution, erection and installation by any means, of all types of the following items, including but not limited to: appliances: such as refrigerators, washers, dryers, ranges, dishwashers, fumehoods, exhaust fans, refrigeration cases, etc.; sporting, exercising and amusement equipment; seating; decor packages: such as signs, pictures, artwork, appliques, etc.; awnings; skylights; column covers; window capping, facias and soffets, siding, toilet partitions and lockers; caulking and weatherproofing; blocking and protection work; shelving, racks, countertops, tub enclosures, metal roofing, and 3-M fire dam spray and other similar products for spray applied Joint Sealer.

## ARTICLE 11
### WORKING RULES

Those of the Council's Working Rules set forth in Schedule "C" attached hereto constitute, and are hereby made a part of this Agreement and set forth in detail certain of the conditions of employment which shall prevail during the term of this Agreement.

In addition, it is agreed and understood that if any employee ceases or refuses to work with a non-union employee, or chooses to comply with the provisions of Working Rule 17, such action shall not be deemed a violation of this Agreement, and no employee shall be disciplined or discharged by reason of such action.

## ARTICLE 12
### SUB-CONTRACTOR CLAUSE

The Employer agrees that he will not subcontract any work which is covered by this Agreement that is to be done at the site of any job to which this Agreement is applicable, except to a contractor bound by the terms of this Agreement, or to another Agreement with the Council.

22

(c) Anything to the contrary hereinbefore contained notwithstanding, the Council may elect not to follow the procedure for settlement of disputes set forth in Sections (a) and (b) of this Article 14 in respect of claims or disputes arising out of alleged failure by an Employer or other employer to comply with any of the provisions of Article 16 hereof, or Article 17 hereof, or of Article 5 hereof, or Articles 18, 19, 22 and 26.

(d) Irrespective of whether the Council exercises the election granted to it by Section (c) of this Article 14 the Council may, in the event of a claim or dispute such as mentioned in said Section (c), treat as a breach of this Agreement the alleged failure by an Employer to comply with any of the provisions of Article 16, or of Article 17, or of Article 5, Article 18, Article 19, Article 22 or Article 26 and instead, by reason of such failure persuades or directs employees covered by this Agreement not to accept employment by, or to cease rendering any further service to such Employer or other employers, then the delinquent Employer, or other delinquent employer, shall be obligated to pay the wages and the fringe benefit contributions of such employee or employees who cease to render any further service to such delinquent Employer or other delinquent employer, until such time as the delinquent reports and/or payments, if due, have been made. In no event shall such wages or fringe benefit contributions be paid to those employees who were not employed at the time of such refusal to render further service. Such persuasion or direction by the Council to the employees, and the cessation of work, or the refusal to accept employment, by the employees shall not be deemed to be a violation of Section (a) of this Article 14.

23

## ARTICLE 15

### COUNCIL'S BUSINESS REPRESENTATIVES

Business Representatives of the Council shall have access to any and all jobs where employees to whom this Agreement is applicable are working.

## ARTICLE 16

### HEALTH AND WELFARE FUND; INDUSTRY ADVANCEMENT PROGRAM

The Employer agrees to be bound by the terms of the Industry-wide Agreements covering Commercial, Industrial and Institutional work, which establish and provide for payments to Fringe Benefit and Industry Advancement Program ("IAP") Funds as set forth in EXHIBIT "E", and agrees to any increases when they are negotiated.

Section 1. The Employer shall, on or before the tenth day following the end of each payroll Week, pay to Mellon Bank or to such other corporate fiduciary as shall be from time to time mutually agreed upon by the Association and Council (any of which is hereinafter referred to as the "Depository" or "Trustee"), a sum as specified in Section 2 for each hour (whether regular time or overtime) for which wages or any type of compensation payable (under this Agreement) are payable during such payroll week to any employee, as the term employee is defined in Article 2 hereof. Each such hour is hereinafter referred to as an "hour worked".

Section 2. Except as may otherwise be provided pursuant to the terms of this Agreement, the Health and Welfare payment rates for each hour worked are

24

(a) $5.99 per hour worked for the period May 1, 1997 to April 30, 1998.

(b) May 1, 1998 to April 30, 1999  ⎫
(c) May 1, 1999 to April 30, 2000  ⎬  To Be Determined
(d) May 1, 2000 to April 30, 2001  ⎭

Section 3. (A). A trust heretofore established and known as "Carpenters Health and Welfare Fund of Philadelphia and Vicinity" shall continue to provide (out of the monies paid into said Fund and out of the income from the investment of said monies), for the sole and exclusive benefit (1) of employees and their dependents, and (2) of the "Participants", as hereinafter defined, and their dependents, such of the following benefits and services as the Council may from time to time, subject to the conditions set forth in the Agreement and Declaration of Trust, determine: Medical care, hospital care, compensation for injuries or illness, death benefits, vacation benefits, disability and sickness benefits, accident benefits, and any like benefits, and insurance to provide any or all of the foregoing benefits and services.

(B). The Carpenters' Health and Welfare Fund of Philadelphia and Vicinity shall be administered and maintained pursuant to a Memorandum of Understanding attached hereto and incorporated herein as "Exhibit F."

Section 4. The Industry Advancement Program shall be established and maintained pursuant to a memorandum of understanding attached hereto and incorporated herein as "Exhibit G."

25

## ARTICLE 17

### PENSION AND ANNUITY PLAN

Section 1. The Employer shall, on or before the tenth day following the end of each Payroll Week, pay to Mellon Bank, or to such other corporate fiduciary as shall be from time to time mutually agreed upon by the Association and Council, (is hereinafter referred to as the "Depository" or "Trustee") a sum as specified in Section 2 for each hour worked for a Pension and Annuity contribution. For purposes of this Section, "hour worked" shall mean each hour (whether regular time or overtime) for which wages or any type of compensation required under this Agreement is payable during such Payroll Week to any employee, as the term "employee" is defined in Article 2 hereof. Each such hour is hereinafter referred to as an "hour worked."

The Annuity portion of the contribution will be earmarked to individual accounts.

Section 2. Except as may otherwise be provided pursuant to the terms of this Agreement, the Pension/Annuity payment rates for each hour worked are:

(a) $5.90 per hour worked for the period May 1, 1997 to April 30, 1998.

(b) May 1, 1998 to April 30, 1999  ⎫
(c) May 1, 1999 to April 30, 2000  ⎬  To Be Determined
(d) May 1, 2000 to April 30, 2001  ⎭

Section 3. (A). A trust to be known as "Carpenters Pension and Annuity Fund of Philadelphia and Vicinity" (referred to hereinafter as the "Pension Fund") shall be established and maintained for the purpose of providing (out of the monies paid into said Fund and out of the income from the investment of said monies) such program of pension or annuity benefits for the sole and exclusive benefit of employees and other "Participants" mentioned in the Agreement and Declaration of Trust hereinafter mentioned, as the Council may from time to time determine in conformity with limitations contained in said Agreement and Declaration of Trust.

(B). The Agreement and Declaration of Trust created for the purpose of establishing and administering the Pension Fund shall provide that no compulsory retirement may be required; shall contain, inter alia, provisions identical (except in that they shall refer to the Pension Fund) with clauses (1) through (9) of Section 3 (b) of Article 16 (as contained in the Memorandum of Understanding attached as Schedule "F") and shall, in all other respects, be as nearly identical as possible with the provisions of the Agreement and Declaration of Trust creating the Carpenters Health and Welfare Fund of Philadelphia and Vicinity).

## ARTICLE 18
### WORK DUES AND JOBS RECOVERY DUES CHECK-OFFS
#### Section 1

Each such Employer shall deduct from the wages of all employees who are covered by this Agreement and who have signed and delivered to the Employer proper legal authorizations for such deductions, a work dues

check-off of a percentage amount of the gross wages (as certified by the Council) to be deducted from the net wages, (including regular time and overtime), for which wages or any compensation are paid by the Employer to said employees.

In addition to the work dues the Employer shall also deduct from the wages of each Employee covered by this Agreement a sum as certified by the Council for each hour worked under this Agreement as Jobs Recovery Dues. Said dues shall be remitted to the Council simultaneous with, and in the same manner as, the dues otherwise described in this Article and shall be subject to the provisions of this Agreement dealing with the delinquent payment of monies, including dues payable to the Council, by the Employer.

#### Section 2

Each such Employer shall, within ten days after the end of each Payroll Week, transmit to the Depository, as provided in Article 16, Section 1 hereof, amounts deducted during such Payroll Week pursuant to Section 1 of this Article 18, together with the Employer's report of said deductions, which report shall be on the same form as is used by the Employer for reporting payments due by the Employer as contributions made pursuant to Articles 5, 16, 17, 22, and Article 26 hereof.

#### Section 3

Any employee who loses his good standing in his Local Union by reason of his failure to tender to the Local Union periodic membership dues and/or initiation fees uniformly required, or who is in arrears in the payment of Work Dues or Jobs Recovery Dues to the Council, shall, upon written notice to that effect from the Council to the Employer, be discharged.

## ARTICLE 19
### DELINQUENCY AND COLLECTION PROCEDURE

Section 1. The provisions of this Article shall apply with equal force and effect to the contributory and withholding obligations set forth in Article 5 (Joint Apprentice Committee), Article 16 (Health and Welfare Fund-Industry Advancement Program), Article 17 (Pension and Annuity Fund), Article 18 (Work Dues and Jobs Recovery Dues Checkoffs), Article 22 (Political Action Committee) and Article 26 (National Apprenticeship and Health and Safety Fund) of this Agreement.

Section 2. All payments shall be remitted to the depository designated herein on Report Forms designated, as appropriate, by the Funds or Council. In the event that the report accompanying any payment made to the Depository pursuant to Article 5 (Joint Apprentice Committee), Article 16 (Health and Welfare Fund-Industry Advancement Program), Article 17 (Pension and Annuity Fund), Article 18 (Work Dues and Jobs Recovery Dues Checkoffs), Article 22 (Political Action Committee) and Article 26 (National Apprenticeship and Health and Safety Fund) of this Agreement shows that the full sum as therein required is not paid, or is not intended to be paid, then the Depository shall dispose of said payment by distributing to each party such portion of the remittance in proportion to the fraction that each such recipient's hourly remittance bears to the total hourly remittance required by this Agreement.

Section 3. To the extent that an employee has not performed Covered Employment during the reporting period, the Employer shall so advise the Funds of that fact in the time and by the method otherwise provided for the remittance of contributions herein.

Section 4 (A). Except as otherwise specifically provided herein, payments not received by the 10t day following the payroll week which the Repo covers shall be considered "delinquent" for purpose of this Agreement.

(B). If the Trustees of the respective Funds, i their sole discretion, determine that an Employer has satisfactory record of timely payments, the Trustee may notify such Employer in writing that its payment into the respective Funds will be required by the 15t day following the end of each calendar month, which shall be the "Due Date."

Section 5. Payments received by the Fund o Council later than ten (10) days after the due date shal incur and shall include a liquidated damages charg equal to ten percent (10%) of the gross amount du each Fund or Council if submitted after the due date

Section 6. In addition to the liquidated damage charge provided for above, the alleged failure of th Employer to make payments when due or payment received later than ten (10) days after the due date shal subject the Employer to one or more of the followin actions:

(A). As otherwise described in Article 14, th Council shall have the right to withhol employees covered by this Agreement unti all sums due (including liquidated damages are paid. If such action shall, in the dis cretion of the Council, prove necessary o desirable, the employees whose labor is thu withheld, shall be paid their wages an fringe benefits for all time lost pendin payments by the Employer as provided i Article 14.

(B). The appropriate Funds and/or Council may institute formal collection proceedings that may include the institution of legal action 30 days after the Due Date against the Employer, to secure, and if necessary, to compel payment of the monies described herein. In the event that an Employer is delinquent in the payment of contributions, the Employer shall pay (in addition to the principal sums due and the ten percent (10%) liquidated damages) interest calculated in accordance with ERISA, all costs of suit (including reimbursement for Fund administrative time) and attorneys' fees and costs, regardless of whether suit or other formal proceedings are instituted.

Section 7. The Employer shall, simultaneous with the remittance of monies described herein, transmit to said Depository, a report containing (1) the names and Social Security numbers of the persons to whom this Agreement is applicable, who have been in the employ of the Employer during such payroll week; (2) the number of hours during said payroll week for which wages or any type compensation are payable under this Agreement; and (3) such other payroll information as the Boards of Administration of the Funds herein provided for may reasonably require for the proper administration of said Funds.

Section 8. Surety Bonds.

(A). The payments to be made and, where appropriate, monies to be withheld, as provided in Article 5 (Joint Apprentice Committee), Article 16, Section 2 (Health and Welfare Fund - Industry Advancement Program), Article 17, Section 2 (Pension and Annuity Fund), Article 18 (Work Dues and Jobs Recovery Dues Checkoffs), Article 22 (Political Action Committee) and Article 26 (National Appren-

ticeship and Health and Safety Fund) of this Agreement shall be guaranteed and secured in the following manner:

(i) Each Employer to whom this Agreement is applicable, and every other employer who is a party to another collective bargaining agreement with the Council covering the same work and jurisdiction as specified in Article 10 of this Agreement, shall furnish at his own cost and expense a bond, with a recognized and responsible corporate surety, in the face amount of $40,000.00 guaranteeing such payments or, in the alternative, shall furnish his own bond in the sum of $40,000.00 guaranteeing such payments and shall deposit with the Trustee as collateral security for the faithful performance of his said bond Forty Thousand Dollars ($40,000.00) in cash or in securities acceptable to the Trustee.

(ii) The Council agrees that it may include in any collective bargaining contract with an Employer for whom the Association does not act as the collective bargaining representative, if said contract covers the same work and jurisdiction as covered in Article 2 of this Agreement, provisions requiring such Employer to make the same payments to the Depository as are required by subsection (A) of this Section 8, and to guarantee or secure the faithful making of such payment by the deposit of Forty Thousand Dollars ($40,000.00) in cash with the Trustee or by the Bond of a recognized and responsible corporate surety. In the event that any such Employer shall furnish the Bond of a corporate surety, the Association shall, out of

the funds of said Industry Advancement Program, pay the premium for such Bond, provided such premium is in a reasonable amount; if such premium shall be in an amount greater than usually charged for such Bond, such Employer shall, himself, pay the difference between Five Hundred Dollars ($500.00) and the amount of said premium, and the Association shall pay, out of the funds of the Industry Advancement Program, Five Hundred Dollars ($500.00) of said premium.

(B). Every Employer and every other employer who is a party to another collective bargaining agreement with the Council covering the same work and jurisdiction as specified in Article 2 of this Agreement, in the event such Employer or such other employer is required to give surety as provided in clause (ii) of subsection (A) of this Section 8, shall upon certification to him and to the Council by the Trustee, that such Employer or other employer is in default in the payments required of him by this Section 8, furnish further corporate surety to assure payments required under this Section 8 by such Employer or other employer to an amount of Forty Thousand Dollars ($40,000.00) over and above the amount of such payments in default, or, in the alternative, shall deposit with the Trustee as collateral security for the faithful performance of his own Bond assuring said payments, a further amount in cash or in securities acceptable to the Trustee, sufficient to restore such collateral security to an amount of Forty Thousand Dollars ($40,000.00).

Section 9. Prior to entering into any subcontract for work covered by this Agreement, the Employer

will verify with the Fund that the proposed subcontractor has a signed Agreement and has posted the fringe benefit bond required under this Agreement. After the Employer has contacted the Fund, the Fund will inform the Employer in writing within 72 hours if the proposed subcontractor does not have a fringe benefit bond, and/or an Agreement. The Employer will not enter into a subcontract until the subcontractor has posted a bond and signed an Agreement. The failure of the Employer to comply with this Section 9, will require the Employer to be primarily responsible for all Wages and Fringe Benefits of a sub-contractor who does not have a Bond and/or Agreement with the Council.

The Employer agrees that, upon written notice from the Fund that its subcontractor is delinquent in the payment of fringe benefits on his particular project, the Union, the subcontractor, and the Employer shall meet to resolve said delinquency. In the event that satisfactory arrangements to collect the delinquency are not made, a jointly payable check in the amount of said delinquency shall be issued to the Funds by the Employer. This will not preclude the Union from exercising its rights provided in Article 14.

Section 10. Estimated payments in advance for all payments (except wages) required under this Agreement will be made by the Employer if it has failed to demonstrate in the sole and exclusive judgment of the Council, a current record of timely payments with the Funds.

Section 11. The Employer shall also, upon request of any agent or designee of the Board of Administration, permit such agent during regular business hours to inspect and make copies of any and all records of the Employer pertaining to compensation paid to

employees, hours worked by employees, monies withheld from employees for taxes paid on account of employees, and all other records relevent to, and of assistance in determining the Employer's obligations hereunder to make payments to the Depository have been faithfully performed. If such inspection and/or audit reveals the Employer failed to make such payments in full, the Employer shall be required to pay for the cost of such inspection and/or audit at the rate of One Hundred Dollars ($100.00) per day as well as any additional monies provided for herein.

## ARTICLE 20
### CARPENTERS/ASSOCIATION JOINT COMMITTEE

There is hereby established a Carpenters/Association Joint Committee, which shall be comprised of an equal number representing the Union and the Association, for the purpose of reviewing on a quarterly basis problems confronting the industry and developing resolutions for same.

Parties agree that during the life of this contract, they will implement a Jobs Recovery Program covering the counties of Montgomery, Chester, Delaware, Bucks, Lehigh, Northampton and Carbon, in order to enable employers signatory hereto to bid jobs in those counties on a competitive basis. Monthly meetings will be held to discuss job recovery.

## ARTICLE 21
### LEGALITY

Should any part of this Agreement be found illegal by a court of last resort, only such part shall be declared null and void.

## ARTICLE 22
### POLITICAL ACTION COMMITTEE CHECK-OFF
#### Section 1

Each Employer shall deduct from the wages of all employees who are covered by this Agreement and who have signed and delivered to the Employer proper legal authorizations for a check-off deduction for each hour worked to the Carpenters' Political Action Committee of Philadelphia and Vicinity in such amount as certified by the Council as having been authorized by such employees.

#### Section 2

Each such Employer shall, within ten (10) days after the end of each Payroll Week, transmit to the Depository as defined in this Agreement amounts deducted during such Payroll Week pursuant to this Article, together with the Employer's report of deductions, which report shall be on the same form as is used by the Employer for reporting payments due by the Employer as contributions made to the Health and Welfare and Pension Funds.

## ARTICLE 23
### MOST FAVORED NATION CLAUSE

It is understood that if the Council enters into any Agreement with any Contractor or Association engaged in commercial, institutional, or industrial construction within the area designated herein, upon more favorable terms to such other Contractor or Association than are embodied in this Agreement between IFCA and the Council, then this Agreement shall be amended so as to afford to IFCA and its members the same more favorable terms; provided, however, that

## PREAMBLE

Lathers Local Union #53-L, of the Metropolitan Regional Council of Philadelphia and Vicinity, United Brotherhood of Carpenters and Joiners of America ("Union"), and the Master Plasterers Company of Philadelphia, a division of the Interior Finish Contractors Association of Delaware Valley ("Employer"), hereby agree that the wages, payments required, hours, and working conditions contained in the Agreement between the Metropolitan Regional Council and the Interior Finish Contractors Association, ("Carpenters Agreement"), shall apply to all Employers and employees covered by this Agreement ("Lathers Agreement"), except that where any term or provision of the Lathers Agreement in any way conflicts with or differs from a term or provision of the Carpenters Agreement, such term or provision of the Lathers Agreement shall supercede the term or provision of the Carpenters Agreement.

## ARTICLE 1
### ARTICLES OF AGREEMENT

This Agreement, effective May 1, 1997 to April 30, 2001, by and between the Master Plasterers Company of Philadelphia, a division of the Interior Finish Contractors Association of Delaware Valley (hereinafter referred to as the "Association"), acting for and on behalf of itself and, pursuant to authority duly granted, for and on behalf of each of its present and future members who have assigned bargaining rights to the Association (individually hereinafter referred to as the "Contractor" or "Employer"), and for any other Employer who is not a member of the Association, but who agrees to be bound hereto by signing Exhibit H (Employer's Acceptance of Agreement), of the Carpenters Agreement and the METROPOLITAN REGIONAL COUNCIL OF PHILADELPHIA AND

VICINITY and the UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, and LATHERS LOCAL UNION #53-L (hereinafter referred to as the "Union"), located and having jurisdiction in the Counties of Philadelphia, Delaware, Montgomery, Chester, Bucks, Lehigh, Northampton and Carbon, in the Commonwealth of Pennsylvania, and the following Counties in the State of New Jersey: Camden, Gloucester, and parts of Salem, Atlantic and Cumberland, and their present and future members, and of other employees (as hereinafter defined) of the Employer.

A Wage and Fringe Schedule is attached to this Agreement Booklet . . . . . . . . . . . . . . . as Exhibit "I".

## ARTICLE 10
### WORK JURISDICTION

The following provisions concerning work jurisdiction control the employment of Lathers and this Article 10 replaces Article 10 of the Carpenters Agreement.

The Employer shall recognize the jurisdiction of the Lathers Union #53-L, and the parties hereto agree to be bound by the following work jurisdiction, including but not limited to the prefabrication, installation, erection, construction and completion of the following work, which shall be assigned to and performed by journeymen Lathers and Apprentices: the installing of all heavy and light angle iron for receiving prefab synthetic plaster wall panels, such as dryvit-type systems; the prefabricating, erecting, constructing, installing and completing of all light iron construction, furring, making and erecting of brackets, clips, and hangers, wood, wire and metal lath; plaster board or veneer plaster board to which synthetic plaster-type

materials are applied; corner beads, all floor construction; arches erected for the purpose of holding plaster, cement and concrete.

All carrying bars, purlins and furring, regardless of size; light iron and metal furring of all descriptions such as rods, channels, flat iron and nailock, screw-lock, pomeroy, T-bar, H-bar, Z-bar, metal splines and other ceiling bars or systems for the receipt of metal lath, rock lath and all light iron and metal studs, such as Stran Steel, Penn Metal, Soule, Truscon, or other trade names of metal studs, no matter who the manufacturer, when such studs are to receive metal lath or rock lath or other mechanically fastened material for the application of plaster or other sprayed on wet material; and all other light iron furring erected to receive lath, synthetic plaster-type materials and veneer plaster board.

The nailing, tying and fastening of all wiring and metallic lath such as wire cloth, wire mesh, expanded metal lath, hy-rib and flat expanded metal lath and wire of all descriptions as well as the placing of all hangers to support suspended ceilings or any of the above types of light iron and metal furring which receive lath and plaster-type materials; the placing of all types of floor lath, such as hy-rib lath, paperback steeltex floor lath, Penn Metal rib, etc.

The tying, nailing, clipping or fastening of all types of lath, regardless of size, such as wood lath, plaster board, button board, flaxilinum board, bishopric, celetex, gypsum lath, rock lath, scrim or any and all other types of material erected to receive or hold plaster or synthetic plaster-type materials, or wet fireproofing materials.

The erection of all metal plastering accessories such as metal corner beads, door and window casing beads, metal picture mold, metal chair rail, metal base and

base screed, and any and all other plastering accessories, which are covered and/or serve as a ground, guard, or screed for plaster or synthetic plaster-type materials.

The erection and dismantling of all scaffolding systems shall be assigned to the Lathers, unless the individual employer's past practice has been otherwise, in which case, such individual past practice shall prevail.

Employers will have the flexibility of using workmen between Trades, namely, on occasion if a particular situation warrants it, a Lather can work as a Carpenter alongside of Carpenters, and vice versa.

The Employer and the Union shall have the right by mutual agreement to add to the work jurisdiction as above defined and set forth, and such addition to the work jurisdiction shall be binding upon the parties.

## ARTICLES 16, 17 and 19
## HEALTH & WELFARE FUND
## PENSION & ANNUITY FUND
## DELINQUENCY & COLLECTION PROCEDURE

Articles 16, 17 and 19 of the Carpenters' Health an Welfare Fund, the Pension and Annuity Fund, an Delinquency and Collection Procedure shall apply.

## ARTICLES 18, 22 and 26
## WORK DUES, JOBS RECOVERY DUES,
## PAC FUND CHECK-OFFS and
## NATIONAL APPRENTICESHIP and
## HEALTH and SAFETY FUND

The provisions of Articles 18, 22, and 26 of th Carpenters' Agreement shall apply.

- NOTES -

## Brotherhood's General Trade Jurisdiction

The broad, evolving trade autonomy of the United Brotherhood of Carpenters and Joiners of America includes at its core, but is not limited to, the milling, fashioning, joining, assembling, erection, fastening or dismantling of all material of wood, plastic, metal, fiber, cork and composition, and all other substitute materials, as well as the handling, cleaning, erecting, installing, repair, renovation, maintenance, and dismantling of all machinery, equipment and all materials used by members of the United Brotherhood.

Our claim of jurisdiction, therefore, covers all kinds of work being performed by members of the United Brotherhood and includes but is not limited to the following classifications: Carpenters and Joiners; Millwrights; Pile Drivers, Bridge, Dock and Wharf Carpenters, Divers, Underpinners, Timber Workers and Core Drillers; Shipwrights, Boat Builders, Ship Carpenters, Joiners and Caulkers; Cabinet Makers, Bench Hands, Stair Builders, Mill and Factory Workers; Wood and Resilient Floor Layers and Finishers; Carpet Layers; Shinglers, Siders; Insulators; Acoustic and Dry Wall Applicators; Shorers and House Movers; Loggers, Lumber and Sawmill Workers; Furniture Workers; Reed and Rattan Workers; Shingle Weavers; Casket and Coffin Makers; Box Makers, Railroad Carpenters and Car Builders; Show, Display and Exhibition Workers; and Lathers, regardless of material used; also Public Sector Workers, Health Care Workers, Tile, Marble and Terrazzo Industry Workers and Aerospace Workers; and all those engaged in the operation of woodworking or other machinery required in the fashioning, milling or manufacturing of products used in the trade, or engaged as helpers to any of the above divisions or sub-divisions, and the handling, erecting and installing material on any of the above divisions or sub-divisions; burning, welding, rigging and the use of any instrument or tool for layout work, incidental to the trade; the erection and placement of all materials used in lathing procedures; and all work with and on robotics, included but not limited to rigging, handling, installing, maintaining, programming, and use of all stationary and/or portable robots, this includes the use of all robots used in any industry, including the nuclear field. When the terms "carpenter(s)" or "carpenter(s) and joiner(s)" are used, it shall mean all the divisions and sub-divisions of the trade.

JAN. 6.2000   2:55PM   R~~ONAL COUNCIL                    NO.534   P.2/2

**AGREEMENT WITH THE**
**METROPOLITAN REGIONAL COUNCIL**
**OF PHILADELPHIA AND VICINITY.**
**UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA**

THE METROPOLITAN REGIONAL COUNCIL OF PHILADELPHIA AND
VICINITY, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA
("COUNCIL") and the Undersigned Employer agree that:

1.     The employer shall be and is hereby, bound by all of the terms and conditions of employment
contained in the collective bargaining agreement between the Council and the Interior Finish
Contractors Association of Delaware Valley ("IFCA"), receipt of a copy of which is hereby
acknowledged, that is effective on the date of this Agreement as well as any additions, modifications,
extensions and renewals thereof between the Council and IFCA as may occur subsequent to the
execution of this Agreement.

2.     This Agreement shall be effective as of the date set forth below and shall remain in full force
and effect for the duration of the collective bargaining agreement between the Council and Interior
Finish Contractors Association of Delaware Valley that is effective on the date of this Agreement
and for the duration of any addition, modification or renewal thereof until one party shall provide to
the other written notice by certified mail of intent to terminate the then-current agreement at its
stated expiration th_____than ninety (90) days
prior to the stated e

3.     In the event                                                    he Council and Interior
Finish Contractors                                                     duration, the employer
agrees to pay all w                                                    collective bargaining
agreement agreed t                                                     ters and Interior Finish
Contractors Associ                                                     or Agreement.

4.     If there sho _____ es to deduct two hours
gross pay per day from each of it's union employees permitted to work while a strike is in progress.
The employer will forward these payments to the Metropolitan Regional Council, payable to the
"Strike and Defense Fund", each week during the period of any work stoppage (if such stoppage
should occur) in compliance with Section 55(B) of the United Brotherhood of Carpenters & Joiners
of America.

METROPOLITAN REGIONAL COUNCIL OF
PHILADELPHIA AND VICINITY

_____
EDWARD CORYELL
Secretary-Treasurer

**RECEIVED**
JAN 0 6 2000
TODI

*PHR Services Inc. Trading*
*"McCabe Construction"*
Insert Full Name of Employer

_____
Signature of AUTHORIZED
Employer Representative

325 W. 2nd Avenue
Address

Conshohocken  PA    19428
City        State    Zip

January 6, 2000

1/1      Jan-6-00  2:31PM;                618567900595;                F: MCCABE CONSTRUCTION;      Page 1/1